PEOPLE *v.* OMACHT.
ON REHEARING.

1. COURTS—SUPREME COURT—HEARING OF CASE BY 5 JUSTICES.

Five sitting justices of the 8-member Supreme Court constitute the entire bench and it can determine cases with such number, where 3 justices were disqualified and no protest or objection to the hearing being had before such number of justices was made by counsel for any of the appellants (CL 1948, § 601.5).

2. APPEAL AND ERROR—RECORD—VERDICTS—GREAT WEIGHT OF THE EVIDENCE.

The record must be considered as a whole in determining whether the jury's verdict can be said to be contrary to the great weight of the evidence.

3. CONSPIRACY—TRIAL.

There is great need of precaution looking to a fair trial in conspiracy cases which involve a plurality of defendants.

4. INDICTMENT AND INFORMATION—CONSPIRACY—CORRUPTION OF STATE LEGISLATURE.

Charge of common-law conspiracy to corrupt the State legislature by bribery, as laid in the information *held*, definite, not vague; and to have clearly indicated who and in what manner respective appellants are charged with having violated the law.

5. APPEAL AND ERROR—REHEARING—QUESTIONS REVIEWABLE.

Issues covered satisfactorily in prevailing opinion in companion case on appeal from conviction of common-law conspiracy to corrupt the State legislature by bribery after original hearing by Supreme Court are not discussed in opinion on rehearing.

REFERENCES FOR POINTS IN HEADNOTES

[1] 14 Am Jur, Courts, §§ 57, 58.
[4] 8 Am Jur, Bribery, § 20 *et seq.;* 11 Am Jur, Conspiracy, § 29 *et seq.*
[5] 3 Am Jur, Appeal and Error, § 1158.
[7] 3 Am Jur, Appeal and Error, § 888.
[8] 8 Am Jur, Bribery, § 16; 11 Am Jur, Conspiracy, § 37 *et seq.*

6. Evidence—Conversation—Witnesses.

The testimony of witnesses that they did not hear a particular statement in a conversation would seem to render such testimony of less probative force than that of witnesses who testify positively that the statement was made.

7. Appeal and Error—Weight of Evidence.

It is not the province of the Supreme Court to say that the jury on a trial of common-law conspiracy to corrupt the State legislature by bribery did not accept material parts of the testimony of the people's chief witness and other corroborating testimony as true, rather than that to the contrary by and in behalf of appellant defendants.

8. Conspiracy—Corruption of Legislature by Bribery—Evidence.

Competent evidence justified verdict of conviction as to appellant in common-law conspiracy to corrupt the State legislature by bribery.

Reid and Bushnell, JJ., dissenting.

Appeal from Ingham; Simpson (John), J., presiding. Submitted May 19, 1949. (Docket No. 66, Calendar No. 42,920.) Decided January 9, 1950. Submitted on rehearing April 14, 1950. Decided on rehearing June 27, 1950.

George W. Omacht and others were convicted of a conspiracy to corrupt the legislature of the State of Michigan by bribery. Affirmed.

*Stephen J. Roth,* Attorney General, *Edmund E. Shepherd,* Solicitor General, *Daniel J. O'Hara,* Assistant Attorney General, and *Richard B. Foster,* Special Assistant Prosecuting Attorney, for the people.

*James E. Haggerty (Hugh V. Williams,* of counsel), for appellant Omacht.

ON REHEARING.

BUSHNELL, J. (*dissenting*).     Rehearings were granted in this and the related cases because of the statutory requirement.   CL 1948, § 601.5 (Stat Ann § 27.25) reads in part:

"Whenever there shall be filed a dissenting opinion in a case heard by a quorum of 5 justices only, the parties therein shall have a right to a rehearing before the entire bench upon making a proper application therefor."

The writer of this opinion adheres to the views he expressed in his former opinion.   See *People* v. *Omacht,* 326 Mich 505.   The majority of the Court, however, was of the opinion that no prejudicial error was committed by the remarks of the special prosecutor.   It appears, therefore, that decision in *People* v. *Kolowich,* 262 Mich 137, 151, was overruled.

This conspiracy trial originally included a number of defendants, 18 of whom were grouped as "legislative" defendants, and 5 of whom were classified as "finance" defendants.   Omacht was in the latter group.   The business of the several "independent finance" companies, with which Hancock, Omacht and Cooper were associated, differed from that of the "factory finance" companies, and from the operations of "small loan" companies.   The 3 groups were opposed to each other in their legislative objectives.   The "finance" defendants were denied separate trials.   Thus they involuntarily became a part of what has been characterized a "mass" trial.

Mr. Justice CAMPBELL in *People* v. *Barkelow,* 37 Mich 455, warned against the inherent danger of conspiracy trials, saying:

"There is no class of cases where defendants are better entitled to the protection of the law against vague charges than where they are charged with conspiracy.   The course of legal experience has

shown this to have been a familiar resort to catch innocent persons, by throwing a dragnet of vague charges, and resorting to suspicions and prejudices to induce juries to convict persons who find it impossible to escape the malicious insinuations of false accusers. Titus Oates' plot has been a warning to all courts and jurists not to encourage any looseness in charges which in exciting times juries and communities are only too ready to catch at to punish those who are unfortunate enough to be suspected."

Similar observations regarding guilt by association appear in *Krulewitch* v. *United States*, 336 US 440 (69 S Ct 716, 93 L ed 790).

In *Kotteakos* v. *United States*, 328 US 750, 773, 776, 777 (66 S Ct 1239, 90 L ed 1557, 1571, 1573) it was said:

"The proceedings are exceptional to our tradition and call for use of every safeguard to individualize each defendant in his relation to the mass.    *    *    * Here, if anywhere,    *    *    *    extraordinary precaution is required, not only that instructions shall not mislead, but that they shall scrupulously safeguard each defendant individually, as far as possible, from loss of identity in the mass. Indeed, the instructions often become, in such cases, his principal protection against unwarranted imputation of guilt from others' conduct. Here also it is of special importance that plain error be not too readily taken to be harmless."

Consequently, when a trial judge approves such a method he must strictly apply the evidentiary safeguards. This exacting standard of protection of these defendants' rights was not maintained.

Omacht and others were indicted by a one-man grand jury for conspiring to wilfully and corruptly affect and influence the legislature in connection with the passage of Senate Bills Nos 41, 85 and 166. The provisions of Senate Bill No 41 were confined

to the "small loan" business. Reference to this bill was stricken from the information before trial. When testimony was offered with respect to it and the claimed bribery of legislators in connection with its passage, the "finance" defendants objected. The testimony, however, was received as "probative force to the finance bills."

This ruling was incorrect because the testimony had no probative value to the other bills. *People* v. *Giddings,* 159 Mich 523, 527 (18 Ann Cas 844), and *People* v. *Willson,* 205 Mich 28, 39, 40. Nor was such evidence admissible against the "finance" defendants under the statute. CL 1948, § 768.27 (Stat Ann § 28.1050). This statute imposes limitations upon the introduction of intent evidence. It requires proof of "like acts or other acts of the defendant which may tend to show his motive, intent," et cetera. Whatever was the finance defendants' relation to the passage of Senate Bills Nos 85 and 166, they did not conspire with respect to Senate Bill No 41, nor were they so charged in the amended information. Their actions with respect to Senate Bill No 41 were the very antithesis of conspiracy. That bill was supported by the "small loan" companies, whose interests were opposed to the independent "finance" companies. It passed the Senate by a vote of 25 to 2. The language of the statute, *supra,* does not permit defendants' guiltless actions concerning Senate Bill No 41 to be used to convict them of a conspiracy with respect to other bills. See *People* v. *Kolowich,* 262 Mich 137, 149.

This error was magnified when the defendants were improperly refused, on cross-examination, the opportunity of showing their disassociation from any Senate Bill No 41 conspiracy. Although the scope of cross-examination is largely within the discretion of the trial judge, he may not deny a defendant the opportunity to explain that which should

have been excluded in the first instance. See *Alford* v. *United States,* 282 US 687, 694 (51 S Ct 218, 75 L ed 624, 629), and *Thompson* v. *Richards,* 14 Mich 172, 184.

These errors were not cured by the court's instructions to the jury. Paragraph 151 of the charge compounded all of the previous errors. The trial judge said to the jury:

"I further charge you that during the trial certain evidence was allowed pertaining to Senate Bill 41 and various other bills introduced in the legislature that the people claim affected the finance companies. These bills were only admitted by way of explanation as to the conduct of the finance defendants, and to show probable motive and intent, and not to show that they were guilty of a conspiracy as to Senate Bill No 41, or the other bills that affected them, other than the two bills charged in the information—Senate Bill 85 and Senate Bill 166."

These instructions continued the erroneous position taken, that evidence of intent concerning Senate Bill No 41 could be taken by the jury as substantive evidence of conspiracy regarding Senate Bills Nos 85 and 166. Other references to Senate Bill No 41, such as paragraphs 56 and 150 of the charge, further reiterated the error in the reception of intent evidence. Thus the harm previously done defendants was doubled, and requires a new trial.

Neither the majority opinion originally filed nor those as yet proposed on rehearing discuss the great weight of the evidence. The original opinion merely says: "The record abundantly justifies Omacht's conviction." *People* v. *Omacht,* 326 Mich 505, 512. The circumstances of the case require discussion of the testimony. See CL 1948, § 618.63 (Stat Ann § 27.1043); *In re McIntyre's Estate,* 160 Mich 117, 120; *Hall* v. *Proctor,* 221 Mich 400, 404; and *Crip-*

*pen* v. *Chatterton,* 228 Mich 532, 534.   See, also, CL 1948, § 780.201 (Stat Ann § 28.1121).

In the *Crippen Case* Mr. Justice Fellows said:

"Since the enactment of this provision this Court has carefully avoided usurping the functions of the jury and setting aside verdicts solely because they do not comport with our views of what they ought to be, and we have reversed cases under this statute, only in those cases where the verdict is so manifestly against the overwhelming weight of the evidence as that the decision of the trial judge denying the motion for a new trial amounts to an abuse of discretion.   But where the verdict is clearly against the overwhelming weight of the evidence our duty is clear, and we have never shirked it even though it was exacting and disagreeable."

We follow the practice so simply described by Mr. Justice Wiest in *Patterson* v. *Thatcher,* 273 Mich 597, 600:

"We confine ourselves to a comprehensive review of all of the evidence, having in mind the burden of proof and according due allowance to the advantage had by the jury in facing the witnesses, and from the record determine whether or not the verdict is so plainly a miscarriage of justice as to call for a new trial."

Ralph W. Smith, a director of the Michigan Small Loan Association, connected the "finance" defendants with the conspiracy.   He attended a meeting on December 1, 1938, at the Statler Hotel in Detroit, where 25 or 30 representatives of the "finance" companies were present.   They were seated at a long table at the head of which was defendant Cooper. Smith described a conversation in which a statement was made in a low voice.   According to his recollection someone said "that the lobbyist was to use his best judgment and influence the votes whichever way he could, and the substance was that if nec-

essary, to buy votes." Thirteen other witnesses, when questioned about this conversation, denied that it ever took place.

It was at this meeting that Charles F. Hemans was suggested as a legislative representative of their interests. Hemans was then a respected and reputable lawyer, who had practiced law since 1921. He had served as a regent of the University of Michigan for 8 years, and enjoyed the reputation of having a broad experience in the legislative field. He first met the "finance" defendants on January 26, 1939, when they and about 9 others discussed his availability to represent them. He was specifically asked whether he represented any conflicting interests such as "small loan" companies. After he returned to Lansing he was sent a $500 check as a retainer, together with a letter explaining the situation.

Subsequent relations between Hemans and the "finance" defendants were generally by letter, and all payments were made to him by check. At the time no one suspected Hemans' true character. The record in the instant case and the files of this Court show that Hemans, though on a retainer from the "finance" companies, was at the same time representing those who were actively opposed to such interests, and that he accepted fees from both groups. Hemans' subsequent corruption of members of the legislature is discussed in a number of decisions of this Court, and he has since pleaded guilty thereto. He was the State's chief witness, and he wore the uniform of a major in the United States army when he testified. Even then the extent of Hemans' activity was not generally known. It has subsequently developed that Hemans was paid by the State and for many months enjoyed a liberal expense allowance.

The record is clear that the total sum placed in Hemans' hands by the "finance" defendants was $7,250. Defendant John Hancock, who was appointed treasurer of the group, kept a detailed account of the moneys he received from the "finance" companies. These contributions totaled $8,400. He also detailed all the expenditures.

Hemans testified to bribes paid legislative defendants in connection with Senate Bills Nos 85 and 166 at a time when these bills were not even in existence, and before he was ever retained by the "finance" defendants. He insisted that his arrangement with them was that he would be supplied with money "for expenses, such as hotel incidentals, payment to legislators to influence their votes."

He was permitted to refresh his recollection by a memorandum which he made on a sheet of paper early in the 1939 session of the legislature, which date he fixed as sometime "by the end of January." This exhibit contained names of certain members of the House and Senate. Hemans concluded from amounts set opposite these names that he had disbursed $8,350 supplied by the "finance" defendants. He testified that $2,100 was paid to 9 senators, $3,700 to members of the House, and that on the last night of the session he distributed an additional $2,550. If his testimony is true, he did not receive any fee or expense money and used $1,100 of his own funds to bribe members of the legislature for the benefit of his "finance" clients.

It is incredible that those who are claimed to have conspired to corrupt the legislature would conduct their affairs openly with a number of other persons present, keep minutes, and keep written records of moneys collected and disbursed, and conduct their business with their so-called pay-off man largely by correspondence. Conspirators just do not transact

their affairs that way. Nor do they leave behind them a perfect trail of payments by check.

The verdict is so manifestly against the over- whelming weight of the evidence that the decision of the trial judge denying the motion for a new trial amounts to an abuse of discretion. *Crippen* v. *Chatterton,* 228 Mich 532, 534.

As said by Mr. Justice Rutledge in *Kotteakos* v. *United States,* 328 US 750, 765 (66 S Ct 1239, 90 L ed 1557, 1566):

"But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand."

Subjected to a mass trial, accompanied by erroneous rulings of the court and improper argument by the special prosecutor, Omacht and other defendants were not accorded that protection under the Constitutions of the United States and the State of Michigan, which we understand by the general terms "due process and fair trial."

The conviction should be reversed and a new trial should be ordered.

REID, J., concurred with BUSHNELL, J.

NORTH, J. In *People* v. *Omacht,* 326 Mich 505, by a divided Court, we affirmed the conviction and sentence of the defendant. The matter is again before us incident to our having granted defendant's motion for a rehearing and oral argument thereon.

Mr. Justice BUSHNELL has again written for reversal, but notwithstanding his review of the trial proceedings and a recital of much of the factual aspect of the case from which inferences favorable to Omacht and other defendants might be drawn, I cannot concur in the result my Brother has reached.

It seems proper to make it clear at the outset why only 5 of the 8 members of this Court sat on the rehearing of this and the associated cases. At the opening of the oral arguments an announcement, embodied in the Court's records, was made by the Chief Justice to counsel as to the disqualification of 3 members of the Court, in substance as follows: Justice CARR as a grand juror heard these matters and issued the warrants therein. Justice DETHMERS, as a member of the attorney general's department, participated as prosecutor in the proceedings before the grand juror. And Justice BUTZEL because of connection or association with one or more of the defendants in various matters and because the present firm of Butzel, Levin, Winston, et cetera, appeared as of counsel for one of the defendants, considered himself definitely disqualified. Under the circumstances the 5 sitting Justices constituted the entire bench, insofar as the members thereof were not disqualified. See CL 1948, § 601.5 (Stat Ann § 27.25). No protest or objection to the hearing being had before 5 members of the Court was made by counsel for any of the appellants.

Early in his opinion Mr. Justice BUSHNELL says that the majority opinion filed earlier in the instant case appears to overrule the prevailing opinion in *People* v. *Kolowich,* 262 Mich 137. I cannot agree that such a result is fairly inferable. Like the instant case, *People* v. *Kolowich* was decided by a narrowly divided Court. In each case the record must be considered as a whole in determining whether the jury's verdict can be said to be contrary to the great

weight of the evidence. In that respect the record in the *Kolowich Case* differs materially from that in the instant case, and the prevailing opinion therein should not be considered as impliedly overruled by the instant case.

There is no disposition to disagree with the law cited in Justice Bushnell's opinion as to the need of precaution looking to a fair trial in conspiracy cases which involve a plurality of defendants. But we think that was accomplished in the instant case. Surely it clearly appears that the conditions and circumstances assumed in Justice Bushnell's quotation from *People* v. *Barkelow,* 37 Mich 455, cannot, with any degree of justification, be said to be present in the instant case. Herein there are no "vague" charges made. Instead the offense charged is definite; and it is clear who and in what manner the respective appellants are charged with having violated the law. Nor do we find in the instant case resort by the prosecution to "prejudices to induce" the jury to convict falsely accused persons. As has been noted elsewhere, there were 5 so-called "finance" defendants, of whom Omacht was one, and 2 of these 5 were acquitted by the jury.

On this phase of the instant case Justice Bushnell makes reference to *Kotteakos* v. *United States,* 328 US 750 (66 S Ct 1239, 90 L ed 1557), and *Krulewitch* v. *United States,* 336 US 440 (69 S Ct 716, 93 L ed 790). In each of these cases a conviction of an alleged conspiracy was reversed; but for reasons not applicable to the case at bar. In the first of the above cited cases reversal, as appears from a headnote, was adjudged because:

"The evidence proved 8 or more different conspiracies by separate groups of defendants which had no connection with each other except that all utilized one Brown as a broker to handle fraudulent applications."

In the *Krulewitch Case* the headnotes disclose that evidence was admitted over defendant's objection "concerning a statement made by the coconspirator to the complaining witness more than 6 weeks after the * * * [alleged conspiracy] had been completed, which implied that petitioner was guilty." In consequence the court held: "The hearsay declaration attributed to the coconspirator was not admissible on the ground that it was made in furtherance of the conspiracy."

My Brother dwells much upon and again urges that the receipt in evidence of Senate Bill No 41 constituted reversible error. Further comment on this issue is not at all necessary because it was covered, and I think satisfactorily, in the prevailing opinion in *People* v. *Hancock*, 326 Mich 471, and especially in the opinion of Chief Justice Boyles on the rehearing in *People* v. *Cooper, post,* 159.

The issue of whether the verdict was against the great weight of the evidence is considered again at considerable length in Justice Bushnell's opinion. But again that is an issue which has been considered and quite definitely passed upon in opinions submitted by those of the Court who hold that the verdict of the jury should be sustained. See opinions on the original hearings in *People* v. *Omacht, supra; People* v. *Hancock, supra; People* v. *Cooper,* 326 Mich 514; and *People* v. *Shea,* 326 Mich 526; and also the opinion submitted by Chief Justice Boyles on rehearing in *People* v. *Cooper, post,* 159. Nonetheless it may be well to note that in his present opinion my Brother says that no one of the justices who has concurred in affirmance in this group of cases has discussed "the great weight of evidence." If in so stating the writer means that no one of such justices sought to review in detail the testimony in this record, consisting of 4 large printed volumes, he is quite right. But if his statement were to be construed as conveying the im-

pression that the members of the Court who hold for affirmance have not carefully considered the contention that the verdict was against the great weight of evidence, or that they have not expressed themselves on that issue, it would be quite inaccurate. Each of the justices who participated in decision in this group of cases not only had the record and numerous briefs in the case for study and consideration, but they sat on two occasions and heard lengthy and detailed arguments of able counsel in which, as well as in their briefs, this issue was urgently stressed.

In his review of testimony favorable to Omacht and other appellants, my Brother refers to the testimony of Ralph W. Smith "that the lobbyist [Hemans] was to use his best judgment and influence the votes whichever way he could, and the substance was that if necessary, to buy votes;" and Justice Bushnell states: "Thirteen other witnesses, when questioned about this conversation, *denied that it ever took place.*" Doubtless through inadvertence, this latter statement is not strictly correct. At least some of the witnesses only testified in substance that they *did not hear such a statement,* which would seem to render the testimony of these latter witnesses of much less probative force.

It is not within the province of this Court to say that the jury did not accept the material parts of Hemans' testimony and other corroborating testimony as true, rather than that to the contrary by and in behalf of the interested "finance" defendants who have appealed. And further the jury might well have been unable to conceive of any legitimate purpose for which the appealing "finance" defendants provided Hemans with $7,250 as stated in Justice Bushnell's opinion, or why interested finance companies contributed $8,400 to codefendant John Hancock, who functioned as their treasurer, incident

to the activities involved in this prosecution. On the record made we do not think it can be justly said that the verdict of the jury as to the guilt of defendant Omacht was not sustained by competent evidence.

The verdict of the jury and the sentence imposed in the instant case are affirmed.

BOYLES, C. J., and SHARPE, J., concurred with NORTH, J.

DETHMERS, BUTZEL, and CARR, JJ., did not sit.